#565750

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL WELLS,

    Plaintiff,

-vs-

SECURITAS SECURITY SERVICES
USA, INC. and THE UNIVERSITY OF
MICHIGAN,

    Defendants.
_____/

Case: 2:07-cv-15500
Judge: Taylor, Anna Diggs
Referral MJ: Pepe, Steven D
Filed: 12-28-2007 At 11:23 AM
CMP WELLS V SECURITAS SECUIRTY SERVICES
USA INC, ET AL (EW)

Timothy A. Greimel (P61743)
32 Roanoke Lane
Rochester Hills, MI 48309
(248) 425-7525

*Attorney for Plaintiff*
_____/

## COMPLAINT

For his Complaint, Plaintiff Michael Wells ("Mr. Wells"), by and through his attorney Timothy A. Greimel, states:

### JURISDICTION AND VENUE

1.    At least one of Mr. Wells' claims arises under the Constitution, laws, or treatises of the United States.

2.    In accordance with 28 U.S.C. § 1331, this Court has original subject matter jurisdiction over Mr. Wells' claims arising under the Constitution, laws, or treatises of the United States.

3.    Mr. Wells' claims arising under state law form part of the same case or controversy as his claims arising under the Constitution, laws, or treatises of the United States.

4. In accordance with 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over Mr. Wells' claims arising under state law.

5. The events giving rise to Mr. Wells' claims occurred in the judicial district of this Court.

6. In accordance with 28 U.S.C. § 1391(b)(2), this Court is the appropriate venue for this action.

## COMMON ALLEGATIONS

7. Defendant Securitas Security Services USA, Inc. ("Securitas") provides private security officers to clients throughout the United States.

8. Defendant University of Michigan ("U of M") hired Securitas to provide private security officers to guard the power plant (the "Power Plant") on U of M's central campus in Ann Arbor, Michigan.

9. Mr. Wells became an employee of Securitas in 2000 and was assigned to the Power Plant in October 2002.

10. Mr. Wells served as Securitas' site supervisor at the Power Plant.

11. Because U of M exercised substantial control over Mr. Wells' terms and conditions of employment, U of M was a joint employer of Mr. Wells for purposes of the claims contained in this Complaint.

12. On April 4, 2007, Mr. Wells discovered Katherine McCarty ("Ms. McCarty"), a U of M custodian at the Power Plant, in an agitated state.

13. Ms. McCarty told Mr. Wells that another U of M employee named Gerald Avery ("Avery") had sexually assaulted her the previous year.

14. Ms. McCarty said that she was very upset because Avery had recently been visiting the Power Plant while Ms. McCarty was there in violation of a promise U of M made to not allow Avery in the Power Plant while Ms. McCarty was working.

15. In accordance with the Securitas security officer handbook, Mr. Wells notified U of M's Department of Public Safety ("DPS"), Securitas branch manager Diane Logan ("Ms. Logan"), and Michael Pepper, who was Securitas' designated client contact at U of M, about what he had learned from Ms. McCarty.

16. Within a few weeks, DPS told Ms. McCarty that Avery was not to be allowed on the premises of the Power Plant.

17. Upon learning this, Mr. Wells informed U of M employee William Verge ("Mr. Verge") that Avery was not to be allowed at the Power Plant so that Mr. Verge could make the appropriate change to security post orders.

18. On April 27, 2007, Ms. Logan left the Power Plant for over two hours with Richard Wickboldt ("Mr. Wickboldt"), who is U of M's manager of the Power Plant.

19. Upon returning to the Power Plant, Ms. Logan urged Mr. Wells to accept an offer to transfer to a site in Adrian, Michigan that Securitas patrolled for another client.

20. When Mr. Wells repeatedly declined Ms. Logan's "offer" that he transfer, Ms. Logan then began reprimanding Mr. Wells for informing Mr. Verge about the situation involving Ms. McCarty and Avery.

21. Ms. Logan told Mr. Wells that he had created a problem for "the client."

22. Ms. Logan emphatically told Mr. Wells that he was not to speak with DPS in the future.

23. On May 15, 2007, Ms. Logan told Mr. Wells that Mr. Wickboldt had decided that security officers should only serve at the Power Plant for a maximum of two years.

24. On July 30, 2007, Securitas scheduler Karen Triplett ("Ms. Triplett") asked Mr. Wells if Brent Caldwell, another security officer, could do Mr. Wells' job.

25. On August 14, 2007, Ms. Logan told Mr. Wells that he needed to begin training another security officer named Kurt Von Fritz ("Mr. Von Fritz") on August 20, 2007 and that Mr. Von Fritz would replace Mr. Wells as site supervisor on or about August 31, 2007.

26. On August 17, 2007, Ms. Logan insisted, despite Mr. Wells' repeated protests, on adhering to a strict two week training period for Mr. Von Fritz, even though that would mean that Mr. Von Fritz would not receive important training about how to properly handle chemical deliveries.

27. Also on August 17, 2007, Ms. Logan began insisting again that Mr. Wells transfer to the site in Adrian, Michigan to which she had urged him to transfer on April 27, 2007.

28. Mr. Wells again resisted Ms. Logan's "suggestion" that he transfer because it would require him to relinquish his "site supervisor" title, because it would require him to take a pay decrease of more than $2.00 per hour, and because the new site was likely to permanently close in the near future.

29. During this same conversation, Ms. Logan told Mr. Wells that Mr. Wickboldt did not want security officers at the Power Plant who were familiar with the Power Plant's personnel history.

30. When Mr. Wells told Ms. Logan that he wanted to retain his site supervisor position and wanted to receive the same amount of pay if he were transferred to another client site, Ms. Logan told him that that would not be possible.

31. On August 31, 2007, Ms. Logan told Mr. Wells that he was to continue working at the Power Plant for the time being.

32. Although DPS had told Mr. Wickboldt that he was not supposed to discuss the sexual assault on Ms. McCarty with anybody, Mr. Wickboldt called Ms. McCarty into his office on September 4, 2007 to discuss the incident with her.

33. On September 11, 2007, Securitas offered Mr. Wells an interview for a position at another client site in Saline, Michigan.

34. On September 12, 2007, Mr. Wells told Ms. Triplett that he would interview for the position at the Saline, Michigan site.

35. When Ms. Triplett asked Mr. Wells if there were any shifts that he would not be able to work, Mr. Wells replied that he would not be able to work the second shift.

36. On September 13, 2007, Ms. Triplett and Ms. Logan separately asked Mr. Wells to turn over his keys to the Power Plant.

37. Mr. Wells declined to turn over his keys because he was legally bonded to them and could therefore be held liable for their use by others.

38. Also on September 13, 2007, Ms. Triplett asked Mr. Wells to stay on the job for another week to continue to train Mr. Von Fritz, and Mr. Wells agreed to do so.

39. Both Ms. Triplett and Ms. Logan also asked Mr. Wells if he would be willing to continue working at the Power Plant during the second shift as a security officer, rather than the site supervisor.

40. On September 17, 2007, Mr. Wells sent a certified letter to Ms. Logan informing her that he would not be able to work the second shift position.

41. On September 20, 2007, Ms. Triplett called Mr. Wells and asked if he was interested in working the third shift at the Saline, Michigan site or at a site in Milan, Michigan.

42. When Mr. Wells asked for time to think about the third shift offers, Ms. Triplett told him that she needed to know that moment.

43. When further pressed by Ms. Triplett, Mr. Wells said that he supposed he was turning down the possibility of working at the Milan, Michigan site but that he was not turning down the possibility of working the third shift at the Saline, Michigan site.

44. At that point, Ms. Triplett put Mr. Wells on hold.

45. When Ms. Triplett took Mr. Wells off of hold, she told him that the third shift position at the Saline, Michigan site was no longer available and asked him if he was available to work the second shift.

46. Mr. Wells reminded Ms. Triplett that he was not able to work the second shift.

47. At that point, Ms. Triplett told Mr. Wells that she would note that he turned down the job offer and that Securitas' human resources department would be handling all involvement with him in the future.

48. On September 25, 2007, Mr. Wells left on a previously planned and approved vacation until October 3, 2007.

49. On September 26, 2007, Ms. Triplett left Mr. Wells a voice-mail asking Mr. Wells to call her back to set up an interview for a position at the Saline, Michigan site.

50. On Saturday, September 29, 2007, Mr. Wells' mother, who was checking Mr. Wells' mail while he was on vacation, called Mr. Wells to inform him that she had received a letter from Securitas.

51. The letter stated that Mr. Wells was being reassigned to the Saline, Michigan site effective Monday, October 1, 2007, and should report to work at the Saline site that day.

52. Alarmed that Securitas had decided to reassign him to a lesser position with lower pay without his agreement and that Securitas was asking him to report to work while he was on vacation, Mr. Wells called Securitas' branch office on Saturday, September 29, 2007, to tell the human resources personnel there that a mistake must have been made.

53. Mr. Wells was transferred to Ms. Triplett who told him that Belinda Hamilton ("Ms. Hamilton"), the human resources manager, was responsible for arranging for him to start work at the Saline site on October 1, 2007.

54. Ms. Triplett refused to inform Ms. Hamilton that Mr. Wells was on vacation and instead told Mr. Wells that he should send a letter to Ms. Hamilton.

55. When Mr. Wells protested that a letter would never reach Ms. Hamilton before he was expected to report for work on Monday, October 1, 2007, Mr. Wells was told again that he could either send Ms. Hamilton a letter or call her on Monday, October 1, 2007.

56. On Sunday, September 30, 2007, Mr. Wells again called Securitas' branch office in an attempt to reach Ms. Hamilton. The person with whom Mr. Wells spoke took a message and said that Ms. Hamilton would receive it at 8:15 am on October 1, 2007.

57. Having not heard back from Ms. Hamilton, Mr. Wells called her at 9:07 am on Monday, October 1, 2007, but he was put into her voice-mail.

58. Mr. Wells then called the site supervisor at the Saline, Michigan site and left her a voice-mail that a mistake had been made, that he would not be showing up, and that she should contact Ms. Hamilton with any questions she might have.

59. That afternoon, Mr. Wells again called Ms. Hamilton and left her a voice-mail stating that he was not interested in the position at the Saline, Michigan site because it was not a site supervisor position.

60. Mr. Wells never heard back from Ms. Hamilton.

61. On October 4, 2007, Securitas terminated Mr. Wells.

## MICHIGAN WHISTLEBLOWERS' PROTECTION ACT

62. Mr. Wells incorporates by reference paragraphs 1-61 above.

63. Michigan's Whistleblowers' Protection Act prohibits employers from discharging, threatening, or otherwise discriminating against an employee because the employee reports a violation, or a suspected violation, of a law to a public body.

64. Avery's sexual assault on Ms. McCarty was a violation, or a suspected violation, of the law.

65. Mr. Wells reported the sexual assault to U of M's DPS, a public body.

66. Because Mr. Wickboldt, U of M's manager of the Power Plant, did not like the fact that Mr. Wells reported the sexual assault to DPS, he asked Ms. Logan to reassign Mr. Wells to another client's site.

67. As a result, Ms. Logan and other agents of Securitas continually pressured Mr. Wells to accept a transfer to another site, even though the suggested transfers would demote Mr. Wells from his position of site manager, would result in Mr. Wells receiving a lower wage, and would require Mr. Wells to work less convenient hours at less convenient locations.

68. In an attempt to force Mr. Wells to leave his employment, Securitas only offered Mr. Wells positions that involved a demotion, lower wages, and less convenient hours and locations of work.

69. When Mr. Wells resisted Securitas' attempts to transfer him, to demote him, to pay him less, and to require him to work less convenient hours at less convenient locations, Securitas terminated Mr. Wells' employment.

70. As a result of the actions of Securitas and U of M, Mr. Wells has suffered substantial economic and emotional damages.

Wherefore, Mr. Wells requests that this Court award him damages in excess of $5,000,000, exclusive of interest and costs.

## MICHIGAN'S ELLIOT-LARSEN CIVIL RIGHTS ACT – RETALIATION

71. Mr. Wells incorporates by reference paragraphs 1-70 above.

72. Michigan's Elliot-Larsen Civil Rights Act prohibits employers from retaliating or discriminating against an employee because the employee has opposed a violation of the Elliot-Larsen Civil Rights Act.

73. Avery's sexual assault on Ms. McCarty and Avery's continuing presence around Ms. McCarty during the months following the sexual assault constituted sex discrimination, including sexual harassment, in violation of Michigan's Elliot-Larsen Civil Rights Act.

74. Mr. Wells opposed these violations of Michigan's Elliot-Larsen Civil Rights Act by reporting Ms. McCarty's sexual assault to DPS and by discussing the matter with Mr. Verge in order to prevent Avery's continuing presence around Ms. McCarty at the Power Plant.

75. Michigan's Elliot-Larsen Civil Rights Act also prohibits employers from coercing, intimidating, threatening, or interfering with a person on account of his or her having aided or encouraged any other person in the exercise or enjoyment of any right granted or protected by the Elliot-Larsen Civil Rights Act.

76. By reporting Ms. McCarty's sexual assault to DPS and by discussing the matter with Mr. Verge, Mr. Wells aided and encouraged Ms. McCarty in the exercise and enjoyment of her right under the Elliot-Larsen Civil Rights Act to be free from sex discrimination, including sexual harassment.

77. Because Mr. Wickboldt, U of M's manager of the Power Plant, did not like Mr. Wells' actions in opposing violations of Michigan's Elliot-Larsen Civil Rights Act and in aiding Ms. McCarty in the exercise and enjoyment of her rights under the Elliot-Larsen Civil Rights Act, he asked Ms. Logan to reassign Mr. Wells to another client's site.

78. As a result, Ms. Logan and other agents of Securitas continually pressured Mr. Wells to accept a transfer to another site, even though the suggested transfers would demote Mr. Wells from his position of site manager, would result in Mr. Wells receiving a lower wage, and would require Mr. Wells to work less convenient hours at less convenient locations.

79. In an attempt to force Mr. Wells to leave his employment, Securitas only offered Mr. Wells positions that involved a demotion, lower wages, and less convenient hours and locations of work.

80. When Mr. Wells resisted Securitas' attempts to transfer him, to demote him, to pay him less, and to require him to work less convenient hours at less convenient locations, Securitas terminated Mr. Wells' employment.

81. As a result of the actions of Securitas and U of M, Mr. Wells has suffered substantial economic and emotional damages.

Wherefore, Mr. Wells requests that this Court award him damages in excess of $5,000,000, exclusive of interest and costs.

## TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 – RETALIATION

82. Mr. Wells incorporates by reference paragraphs 1-81 above.

83. Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against an employee because the employee has opposed a violation of Title VII of the Civil Rights Act of 1964.

84. Avery's sexual assault on Ms. McCarty and Avery's continuing presence around Ms. McCarty during the months following the sexual assault constituted sex discrimination, including sexual harassment, in violation of Title VII of the Civil Rights Act of 1964.

85. Mr. Wells opposed these violations of Title VII of the Civil Rights Act of 1964 by reporting Ms. McCarty's sexual assault to DPS and by discussing the matter with Mr. Verge in order to prevent Avery's continuing presence around Ms. McCarty at the Power Plant.

86. Because Mr. Wickboldt, U of M's manager of the Power Plant, did not like Mr. Wells' actions in opposing violations of Title VII of the Civil Rights Act of 1964, he asked Ms. Logan to reassign Mr. Wells to another client's site.

87. As a result, Ms. Logan and other agents of Securitas continually pressured Mr. Wells to accept a transfer to another site, even though the suggested transfers would demote Mr. Wells from his position of site manager, would result in Mr. Wells receiving a lower wage, and would require Mr. Wells to work less convenient hours at less convenient locations.

88. In an attempt to force Mr. Wells to leave his employment, Securitas only offered Mr. Wells positions that involved a demotion, lower wages, and less convenient hours and locations of work.

89. When Mr. Wells resisted Securitas' attempts to transfer him, to demote him, to pay him less, and to require him to work less convenient hours at less convenient locations, Securitas terminated Mr. Wells' employment.

90. As a result of the actions of Securitas and U of M, Mr. Wells has suffered substantial economic and emotional damages.

Wherefore, Mr. Wells requests that this Court award him damages in excess of $5,000,000, exclusive of interest and costs.

Respectfully submitted,

December 28, 2007

BY: *[signature]*
Timothy A. Greimel (P61743)
32 Roanoke Lane
Rochester Hills, Michigan 48309
(248) 425-7525

*Attorney for Plaintiff*

**JS 44** (Rev. 11/04)    **CIVIL COVER SHEET** County in which this action arose _Washtenaw_

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

### I. (a) PLAINTIFFS
_Michael Wells_

### DEFENDANTS
_Securitas Security Services USA, Inc._
_University of Michigan_

(b) County of Residence of First Listed Plaintiff _Lenawee_
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
_Timothy A. Greimel_
_32 Roanoke Lane_
_Rochester Hills, MI 48309  (248) 425-7525_

Attorneys (If Known)

Case: 2:07-cv-15500
Judge: Taylor, Anna Diggs
Referral MJ: Pepe, Steven D
Filed: 12-28-2007 At 11:23 AM
CMP WELLS V SECURITAS SECUIRTY SERVICES USA INC, ET AL (EW)

### II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- [ ] 1 U.S. Government Plaintiff
- [X] 3 Federal Question (U.S. Government Not a Party)
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity (Indicate Citizenship of Parties in Item III)

### III. (Citizenship...)
Citizen of Another State □ 2 □ 2 Incorporated and Principal Place of Business in Another State □ 5 □ 5
Citizen or Subject of a Foreign Country □ 3 □ 3 Foreign Nation □ 6 □ 6

### IV. NATURE OF SUIT (Place an "X" in One Box Only)

**CONTRACT**
- 110 Insurance
- 120 Marine
- 130 Miller Act
- 140 Negotiable Instrument
- 150 Recovery of Overpayment & Enforcement of Judgment
- 151 Medicare Act
- 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- 153 Recovery of Overpayment of Veteran's Benefits
- 160 Stockholders' Suits
- 190 Other Contract
- 195 Contract Product Liability
- 196 Franchise

**REAL PROPERTY**
- 210 Land Condemnation
- 220 Foreclosure
- 230 Rent Lease & Ejectment
- 240 Torts to Land
- 245 Tort Product Liability
- 290 All Other Real Property

**TORTS - PERSONAL INJURY**
- 310 Airplane
- 315 Airplane Product Liability
- 320 Assault, Libel & Slander
- 330 Federal Employers' Liability
- 340 Marine
- 345 Marine Product Liability
- 350 Motor Vehicle
- 355 Motor Vehicle Product Liability
- 360 Other Personal Injury

**CIVIL RIGHTS**
- 441 Voting
- [X] 442 Employment
- 443 Housing/Accommodations
- 444 Welfare
- 445 Amer. w/Disabilities - Employment
- 446 Amer. w/Disabilities - Other
- 440 Other Civil Rights

**PERSONAL INJURY**
- 362 Personal Injury - Med. Malpractice
- 365 Personal Injury - Product Liability
- 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- 370 Other Fraud
- 371 Truth in Lending
- 380 Other Personal Property Damage
- 385 Property Damage Product Liability

**PRISONER PETITIONS**
- 510 Motions to Vacate Sentence
- Habeas Corpus:
- 530 General
- 535 Death Penalty
- 540 Mandamus & Other
- 550 Civil Rights
- 555 Prison Condition

**FORFEITURE/PENALTY**
- 610 Agriculture
- 620 Other Food & Drug
- 625 Drug Related Seizure of Property 21 USC 881
- 630 Liquor Laws
- 640 R.R. & Truck
- 650 Airline Regs.
- 660 Occupational Safety/Health
- 690 Other

**LABOR**
- 710 Fair Labor Standards Act
- 720 Labor/Mgmt. Relations
- 730 Labor/Mgmt.Reporting & Disclosure Act
- 740 Railway Labor Act
- 790 Other Labor Litigation
- 791 Empl. Ret. Inc. Security Act

**BANKRUPTCY**
- 422 Appeal 28 USC 158
- 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- 820 Copyrights
- 830 Patent
- 840 Trademark

**SOCIAL SECURITY**
- 861 HIA (1395ff)
- 862 Black Lung (923)
- 863 DIWC/DIWW (405(g))
- 864 SSID Title XVI
- 865 RSI (405(g))

**FEDERAL TAX SUITS**
- 870 Taxes (U.S. Plaintiff or Defendant)
- 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- 400 State Reapportionment
- 410 Antitrust
- 430 Banks and Banking
- 450 Commerce
- 460 Deportation
- 470 Racketeer Influenced and Corrupt Organizations
- 480 Consumer Credit
- 490 Cable/Sat TV
- 810 Selective Service
- 850 Securities/Commodities/Exchange
- 875 Customer Challenge 12 USC 3410
- 890 Other Statutory Actions
- 891 Agricultural Acts
- 892 Economic Stabilization Act
- 893 Environmental Matters
- 894 Energy Allocation Act
- 895 Freedom of Information Act
- 900 Appeal of Fee Determination Under Equal Access to Justice
- 950 Constitutionality of State Statutes

### V. ORIGIN (Place an "X" in One Box Only)
- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from another district (specify)
- [ ] 6 Multidistrict Litigation
- [ ] 7 Appeal to District Judge from Magistrate Judgment

### VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing. (Do not cite jurisdictional statutes unless diversity):
_Title VII of Civil Rights Act of 1964_
Brief description of cause:
_Retaliation against Plaintiff for reporting sexual harassment_

### VII. REQUESTED IN COMPLAINT:
- [ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
- DEMAND $ _5,000,000_
- CHECK YES only if demanded in complaint: JURY DEMAND: [ ] Yes [ ] No

### VIII. RELATED CASE(S) IF ANY
(See instructions): JUDGE _____ DOCKET NUMBER _____

DATE _12-28-07_   SIGNATURE OF ATTORNEY OF RECORD _Timothy A. Greimel_

FOR OFFICE USE ONLY
RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

**PURSUANT TO LOCAL RULE 83.11**

1. Is this a case that has been previously dismissed?   ☐ Yes   ☒ No

   If yes, give the following information:

   Court: _____

   Case No.: _____

   Judge: _____

2. Other than stated above, are there any pending or previously discontinued or dismissed companion cases in this or any other court, including state court? (Companion cases are matters in which it appears substantially similar evidence will be offered or the same or related parties are present and the cases arise out of the same transaction or occurrence.)   ☐ Yes   ☒ No

   If yes, give the following information:

   Court: _____

   Case No.: _____

   Judge: _____

   Notes: _____